# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ELIZABETH FALCONI,                  :        Case No. 1:08-cv-622
                                    :
        Plaintiff,                  :        Chief Judge Susan J. Dlott
                                    :        Magistrate Judge Timothy S. Black
vs.                                 :
                                    :
COMMISSIONER OF                     :
SOCIAL SECURITY,                    :
                                    :
        Defendant.                  :


**REPORT AND RECOMMENDATION[1] THAT: (1) THE ALJ'S NON-DISABILITY FINDING BE FOUND NOT SUPPORTED BY SUBSTANTIAL EVIDENCE, AND REVERSED; (2) THIS MATTER BE REMANDED TO THE ALJ UNDER THE FOURTH SENTENCE OF 42 U.S.C. § 405(g); AND (3) THIS CASE BE CLOSED**


This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding Plaintiff "not disabled" and therefore

unentitled to disability income benefits.  (*See* Administrative Transcript ("Tr.") (Tr. 25-

33) (ALJ's decision)).

## I.

On February 11, 2004, Plaintiff filed an application for disability insurance

benefits ("DIB") alleging a disability onset date of March 1, 2001, due to ulnar

transposition in the left elbow and bipolar disorder.  (Tr. 71-74).

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.

Upon denial of her claims on the state agency levels, Plaintiff requested a hearing *de novo* before an ALJ. (Tr. 41-70, 725-90). A hearing was held on April 13, 2006, at which Plaintiff appeared with counsel and testified. (Tr. 25). A vocational expert, George Parsons, was also present and testified. (Tr. 31)

On November 13, 2006, the ALJ entered her decision finding Plaintiff not disabled. (Tr. 22-33). That decision became the final determination upon denial of review by the Appeals Council. (Tr. 6-8).

Plaintiff was 47 years old at the time of her hearing. (Doc. 9 at 2). She has some college education and previously worked as a waitress and a secretary. (*Id.*)

The ALJ's "Findings," which represent the rationale of her decision, were as follows:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and was insured for benefits through September 30, 2006.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's history of carpal tunnel syndrome with surgical release on the left in December 1999, status post ulnar nerve transposition in the left elbow in January 2005, bipolar disorder, and polysubstance abuse are considered "severe" based on the requirements in the regulations at 20 CFR § 404.1520(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The undersigned finds the claimant's allegations regarding her limitations are not credible for the reasons set forth in the body of this decision.

6.      On and prior to September 30, 2006, the last date insured, the claimant retained the capacity for performing the full range of work, except that she could not lift or carry more than 20 pounds occasionally or 10 pounds frequently.  She also could engage in only occasional use of the hands, occasional overhead reaching, and occasional grasping and gripping with the hands.  The claimant was mentally limited to performing simple, routine, repetitive work in a relatively low stress environment with no strict production requirements.

7.      The claimant's past relevant work as a car driver did not require the performance of work-related activities precluded by her residual functional capacity.  20 CFR § 404.1565.

8.      The claimant's medically determinable impairments did not prevent the claimant from performing her past relevant work on or prior to the date last insured.

9.      The claimant was not under a "disability" as defined in the Social Security Act at any time on or prior to September 30, 2006.  20 CFR § 404.1520(f).

(Tr. 32).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to DIB.  (Tr. 33).

On appeal, Plaintiff argues that: (1) the ALJ erred in determining her RFC; and (2) the ALJ erred in finding that she can work on a sustained basis.  (Doc. 9 at 6-10).

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  In performing this review, the Court considers the record as a whole.  *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled.  As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts.  If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy.  42 U.S.C. § 423(d)(1)(A).

## A.

For her first assignment of error, Plaintiff claims that the ALJ erred in determining her RFC.  Specifically, Plaintiff argues that the ALJ did not provide justification or explanation for why she afforded controlling weight to the opinion of a one time examining psychologist over two treating psychiatrists.

The record reflects that:

In April 2003, Plaintiff was referred by the emergency room to psychiatrist Kenneth Tepe's office because she had been off her medication since February and was having increased mood swings and suicidal ideations. (Tr. 331-33). Plaintiff had been in jail for drug possession and was in a drug treatment program. (Tr. 332-33). She had been clean since October but was having legal issues. (*Id*.) Plaintiff had normal speech, thoughts, and associations; no delusions or hallucinations; variable mood; pleasant affect; passive suicidal thoughts; full orientation; adequate attention; full memory; and "much better" insight and judgment. (Tr. 332). Dr. Tepe diagnosed bipolar II with "opioid" dependence in early full remission. (*Id*.)

In May 2003, Plaintiff sought mental health treatment at Forensic Mental Health. (Tr. 181-94). Plaintiff reported that she was living with and caring for her aging parents. (Tr. 187, 193). She reported an extensive legal history for substance abuse related charges and had been released from jail in February 2003. (Tr. 192-93). Plaintiff was on probation for a drug charge and had not completed a drug treatment program. (Tr. 181). She had been sober since October 2002. (Tr. 149, 168, 188). Plaintiff also reported a diagnosis of bipolar II and past suicide attempts and stated that she had been off her medication for three months and currently was taking medication prescribed by a primary care physician. (Tr. 189, 193). Plaintiff had a normal mental status examination. (Tr. 184). There was concern regarding Plaintiff's motivation for seeking treatment because

of the possibility of her return to prison due to "dirty" urine. (Tr. 180). Substance abuse treatment was recommended. (Tr. 179-80).

In July 2003, Plaintiff went to the emergency room complaining of depression and associated suicidal ideations. (Tr. 273-75). The ER doctor noted that Plaintiff was taking medications for mental illness, was not using drugs, and did not pose a significant risk to herself; he referred her to the Forensic Center. (Tr. 274).

Also in July 2003, Peter A. Boxer, M.D., with Forensic Center, evaluated Plaintiff for medication management. (Tr. 176-77). He noted that Plaintiff had stopped taking some of her medications "on her own" and was not taking other medication as prescribed. (Tr. 176). Dr. Boxer noted that Plaintiff described mild symptoms of depression but her biggest problem seemed to be taking care of her mother who had dementia. (*Id*.) Dr. Boxer noted Plaintiff's history of substance use and chemical dependency treatment as well as her 2002 incarcerations for "dirty" urine. (*Id*.) Plaintiff was also not attending NA or AA meetings on a regular basis. (*Id*.) She described herself as a "functioning addict." (Tr. 177). On mental status examination, Plaintiff was cooperative, alert and oriented; had euthymic mood; had no evidence of mania, hypomania, psychosis, or homicidal ideation; and had only occasional thoughts of passive suicidal ideation but no active suicidal ideation. (*Id*.) Dr. Boxer found it difficult to diagnose Plaintiff's mood disorder given her substance abuse history. (*Id*.) He recommended an intensive outpatient program and adjusted her medication. (*Id*.)

In August and September 2003, Dr. Boxer saw Plaintiff for a follow-up visit. (Tr. 174-75). In August, Plaintiff was in outpatient treatment and was attending NA meetings, but she had used crack on July 15, 2003, the night before her court appearance, and sought emergency room treatment for passive suicidal ideation. (Tr. 175). Plaintiff stated she wanted medication to stop her crack cravings, but Dr. Boxer said there was no proven effective medication. (*Id*.) By September 2003, Plaintiff had been discharged from outpatient treatment because she continued to use cocaine, had "dirty" urine samples, and minimal 12-step attendance. (Tr. 174, 470-82). Dr. Chiappone noted that Plaintiff acknowledged her problem, said she had not used in two weeks, and was scheduled to be re-evaluated for the treatment program. (Tr. 174). Dr. Boxer indicated that he would not continue to treat Plaintiff unless she was seriously working in a substance abuse program. (*Id*.) In October 2003, Plaintiff's case was closed. (Tr. 173).

In March 2004, Dr. Choudy's records indicated that Plaintiff had been out of medication since December. (Tr. 199).

In April 2004, David Chiappone, Ph.D., performed a psychological evaluation at the request of the state agency. (Tr. 234-37). Plaintiff was not currently taking any medication and had not since November 2003. (Tr. 235, 237). Plaintiff told Dr. Chiappone that her last job was in January 2001, in California, and that she stopped working to move to Ohio to care for her ill parents. (Tr. 234). Plaintiff indicated that she had previously been diagnosed with a bipolar condition and had previous psychiatric

hospitalizations. (Tr. 235). Plaintiff also described a history of legal charges, including a felony drug charge as well as substance use treatment. (*Id.*) Plaintiff told Dr. Chiappone that she last used alcohol 20 years ago, last used marijuana one year ago, and had used crack cocaine daily until last year. (*Id.*) Plaintiff stated that she started a treatment program but did not complete it. (*Id.*) Plaintiff lived with her parents; was able to do some chores, including laundry (but could not lift), cooking, and washing dishes; could shop but her father did it; knew how to drive although her driver's license had been suspended; took care of her personal hygiene and self-care; and cared for her parents. (*Id.*)

Dr. Chiappone observed that Plaintiff had average to somewhat rapid pace speech; rambled and her answers were not always concise; had normal thought content; did not appear to be anxious or manic; appeared slightly depressed; was able to follow directions; had average work pace; had good effort and persistence; had good concentration, attention, and memory; did not appear to be malingering; had low-average range intellect; did not appear to be under the influence of substances; was oriented; and did not have the best insight and judgment given her use of substances. (Tr. 236-37). Dr. Chiappone opined that Plaintiff could understand and remember simple, one and two step job instructions; could maintain concentration and attention; could relate to co-workers, supervisors and the public; was only mildly impaired in her ability to carry out and persist; and had moderately reduced stress tolerance. (Tr. 237). His suggested diagnoses

were polysubstance dependence in remission, mood disorder NOS, and personality disorder NOS, and he assessed her Global Assessment of Functioning ("GAF") score at 61 ("mild" impairment in functioning). (*Id.*)

In May 2004 and October 2004, two state agency reviewing psychologists reviewed the record. (Tr. 287-302). The state agency reviewers found Plaintiff moderately limited in three out of 20 categories: in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 300-01). The state agency reviewers opined that Plaintiff's ability to understand and carry out tasks and persist were mildly affected; and that she was able to maintain attention and concentration "fine;" she could relate to others; and her ability to deal with stress was moderately affected. (Tr. 302). The state agency reviewers opined that Plaintiff should be able to complete simple, routine, tasks and some multiple step tasks in a low stress environment. (*Id.*)

On June 2, 2004, Plaintiff presented to Connections Clinic for a psychiatric evaluation for which she was noted to have mood shifts, cycling, poor sleep and found to be hypomanic. (Tr. 330). Plaintiff was prescribed Atarax, Neurontin, and Remeron. (*Id.*)

On December 15, 2004, Plaintiff presented to Dr. Tepe with a "sort of depressed or mixed manic presentation. (Tr. 337, 365). He noted "her thoughts are racing, she's not

sleeping, she can't go into a grocery store without having an anxiety attack and having to leave, and she is generally not doing well." (*Id*.)  On January 4, 2005, Dr. Tepe noted on presentation Plaintiff was a "lot more agoraphobic"[2] and has been isolating.  (Tr. 363).  He also noted that Plaintiff "continues to be pretty anxious." (*Id*.)  Dr. Tepe prescribed Klonopin, Seroquel, Remeron, and Cymbalta for bipolar disorder, depression, and anxiety.  (Tr. 359).

In his RFC, Dr. Tepe noted that Plaintiff's symptoms are primarily due to mood disorder, with periods of remission but unpredictable periods of depression, anxiety, impulsive behavior, poor motivation, concentration, and energy.  (Tr. 304).  He also noted Plaintiff to have poor or no ability to: deal with work stress; understand and carry out complex or detailed job instructions; behave in an emotionally stable manner; or relate predictably in social situations.  (Tr. 305-306).  He further noted that her thoughts race, speech becomes pressured, sleep essentially stops, and she becomes prone to excessive anxiety with little or no provocation that nearly prevents function.  (Tr. 304).  Plaintiff is unable to shop for groceries, for example, and isolates.  (*Id.*)  He opined that Plaintiff would be absent from work about three days per month.  (Tr. 306).

On September 7, 2004, Plaintiff was admitted to Fort Hamilton Hospital for self mutilation.  (Tr. 584).  Dr. Quinton Moss evaluated Plaintiff and found her to have significant problems with suicidal ideation with a plan to hang herself or to slit her throat.

---

[2]    Agoraphobia is an anxiety disorder, often precipitated by the fear of having a panic attack in a setting from which there is no easy means of escape.

(*Id.*)  Dr. Moss diagnosed bipolar disorder and panic disorder and assessed a GAF of 20.[3] (Tr. 580-582).

Dr. Moss also completed a Mental Functional Capacity Assessment on September 9, 2004.  (Tr. 283).  He noted in his assessment that Plaintiff is extremely limited in:  the ability to understand and remember detailed instructions; the ability to maintain attention and concentration for extended periods; and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without a reasonable number and length of rest periods.  (Tr. 285).  He further noted that Plaintiff is unemployable.  (Tr. 286).

In October 2004, Mary Kounan, Psy.D. completed an assessment and noted that Plaintiff is extremely limited in: ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without a reasonable number and length of rest periods; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to set realistic goals or make plans independently of others.  (Tr. 283).  She further noted that Plaintiff is unemployable.  (Tr. 284).

---

[3]    The GAF scale ranges from 0 (severe difficulties) to 100 (superior functioning).  A GAF of 20 indicates "some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication."

In December 2004, Plaintiff complained about mood changes and anxiety. (Tr. 365). Dr. Tepe adjusted her medications. (Tr. 365). Also in December 2004, Dr. Tepe completed a form titled "Medical Assessment of Ability to Do Work-Related Activities (Mental)." (Tr. 304-06). Dr. Tepe noted that Plaintiff's symptoms were consistent with bipolar II disorder and that she had polysubstance dependence in early full remission. (Tr. 304). Dr. Tepe opined that Plaintiff had good or fair ability in all categories of functioning except she had poor or no ability to deal with work stresses; understand, remember and carry out complex or detailed job instructions; behave in an emotionally stable manner; and relate predictably in social situations. (Tr. 305-06). He also opined that Plaintiff would be absent from work about three times a month. (Tr. 306).

By January 2005, Plaintiff was doing better. (Tr. 363). Plaintiff continued to complain of anxiety and agoraphobia but was not using drugs and was attending meetings. (Tr. 363). On mental status examination, Plaintiff had normal speech, thought, memory, and language; cohesive associations; more stable mood; euthymic affect; full orientation and attention; no homicidal or suicidal ideation; fair insight; and "ok" knowledge. (*Id.*)

In February 2005, Plaintiff reported having some physical difficulties and situational problems but her mental status examination findings were similar to the prior findings. (Tr. 359, 361). Plaintiff's mood was better with medication and supportive treatment. (Tr. 359). Plaintiff had stopped active participation and Dr. Tepe recommended that she attend AA/NA. (*Id.*)

By March 2005, Plaintiff was a "mess" and taking "extra" medication and not attending AA/NA. (Tr. 357). Mental status findings were unchanged except for a depressed mood and affect. (*Id*.) Dr. Tepe adjusted her medication and recommended meeting attendance. (*Id.*)

In April 2005, Plaintiff saw Dr. Tepe for follow-up and brought her fiancee. (Tr. 355). Plaintiff complained of unstable moods, and having "passing out" spells and spider bites. (*Id*.) Dr. Tepe noted that Plaintiff was intoxicated for reasons he could not determine. (*Id*.) He questioned whether Plaintiff was taking her medication as prescribed and recommended a medical work-up. (Tr. 355-56). Plaintiff continued treatment throughout 2005, with a three month gap from July to October 2005. (Tr. 343-54). During this time, Dr. Tepe questioned Plaintiff's attendance at meetings (Tr. 345, 349), and noted that she was not taking her medication as prescribed (Tr. 351). He noted that Plaintiff's moods were in reasonable control with the medication and noted that when she used drugs, she deteriorated rapidly. (Tr. 349). Plaintiff's mental status findings were unremarkable except for her mood and affect. (Tr. 345, 349, 351, 353).

In December 2005, Plaintiff said she was hit in a car accident but Dr. Tepe was suspicious that Plaintiff was "high." (Tr. 343). Plaintiff also reported that her medication had been stolen and she asked for narcotics which he refused to prescribe. (*Id*.) Plaintiff also told Dr. Tepe that she was "too busy" to attend meetings. (*Id*.)

By January 2006, Plaintiff was doing better but had some legal problems and said that one of her medications had been stolen. (Tr. 339, 341). Mental status examination

findings were unremarkable, and she had pleasant or euthymic affect and improving mood. (*Id.*) She was not attending meetings. (Tr. 339).

In March 2006, Dr. Tepe reported that Plaintiff was pressured, irritable and labile, had variable mood, dysphoric affect, normal memory and thoughts, cohesive associations, no suicidal or homicidal ideations, difficult attention, fair insight and "ok" knowledge. (Tr. 337). He noted that Plaintiff's behavior was in fair control with external help. (*Id.*) Dr. Tepe adjusted her medication with the goal to stabilize her mood and encouraged sobriety and AA/NA meetings. (*Id.*) At her next visit, Plaintiff was also taking "extra" medication and had "been out of it" for one week but was doing better and looked much better. (Tr. 335).

In her decision, the ALJ found that Plaintiff suffered from severe status post ulnar transposition in the left elbow, bipolar disorder, and polysubstance abuse. None of these conditions met or equaled a Listing. (Tr. 32). In regard to her RFC, the ALJ found that Plaintiff could perform a full range of work except she could not lift or carry more than 20 pounds occasionally or 10 pounds frequently. (*Id.*) The ALJ also found the Plaintiff could engage in only occasional use of the hands, occasional overhead reaching, and occasional grasping and gripping with the hands. (*Id.*) The ALJ further found Plaintiff was mentally limited in performing simple, routine, repetitive work in a relatively low stress environment with no strict production requirements. (*Id.*) Based upon the testimony of the vocational expert ("VE"), the ALJ found that there was work the Plaintiff could perform and denied the claim. (Tr. 31).

Plaintiff maintains that the ALJ provided no justification or explanation for why she afforded controlling weight to the opinion of a one time examining psychologist over two treating psychiatrists. As treating psychiatrists, Plaintiff claims that Dr. Tepe and Dr. Moss were in a better position to assess the severity of Plaintiff's emotional problems than the one time examining psychologist. 20 C.F.R. §§ 404.1527(d)(5) and 416.927(d)(5) ("more weight" is generally given to the opinion of a specialist about medical issues related to the area of their specialty). The ALJ based her opinion on the report by consultative examiner Dr. Chiappone and two psychologists who only reviewed Dr. Chiapponne's report, not the Plaintiff's medical records.

The regulations state that the findings of the treating physicians as to the severity of an impairment should be accorded controlling weight if they are well supported by medically accepted clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. (*See* 20 C.F.R. § 404.1527(d)(2), §416.927(d)(2)). Even if an ALJ does not find that a treating physician's opinion is entitled to controlling weight, she must consider the factors set forth in evaluating any medical source opinion. (*See also* 20 C.F.R. § 416.927(d)). These factors are the length of treatment, frequency of examination, nature and extent of treatment relationship, support of the opinion afforded by medical evidence, consistency of opinion with the record as a whole, and specialization of the treating physician. (*Id*.) The ALJ is required to consider the factors listed in the regulations when evaluating any medical source opinion, treating or otherwise. (*Id*; *see also* Social Security Rulings 96-2p, 96-5p).

After considering the pertinent factors, the ALJ must "give good reasons in [the] notice of determination or decision" for the weight he ultimately assigns the opinion. 20 C.F.R. § 404.1527(d)(2). If the ALJ rejects the opinion completely, she must then give "'specific, legitimate reasons'" for doing so. *See Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996) (quoting *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987)). The regulations provide a list of acceptable reasons to reject a treating source's opinion, such as the nature and length of the treating relationship and the source's medical specialty. *See* 20 C.F.R. §§ 404.1527(d)(1)-(6); 416.927(d)(1)-(6).

Defendant cites several reasons for rejecting the treating physician's opinions, none of which are "specific, legitimate reasons." For example, Defendant notes that Dr. Tepe's records show that when Plaintiff took her medication, her mental condition improved. However, improvement, without additional information, is insufficient to show that Plaintiff had the ability to perform the regular duties of employment. Additionally, Defendant alleges that because Plaintiff testified that she was able to care for ailing family members, engage in craft activities, care for her own personal hygiene, and do some chores, that this diminished her allegations of total disability. However, according to 20 C.F.R. § 404.1545(b), to qualify for disability benefits, Plaintiff must be able to engage in employment activities on a "regular and continuing basis." The activities described by Plaintiff do not equate to the ability to work on a "regular and continuing basis." *See* 20 C.F.R. § 404.1572(c) ("Some other activities: generally we do not consider activities like taking care of yourself, household tasks, hobbies, therapy,

school attendance, club activities, or social problems, to be substantial gainful activities.").

The undersigned does not dispute that it is the ALJ's prerogative to resolve conflicts and weigh the evidence of record. However, it appears, in making this determination, that the ALJ, in part, impermissibly acted as her own medical expert. *See Rousey v. Heckler,* 771 F.2d 1065, 1069 (7th Cir. 1985); *Kent v. Schweiker,* 710 F.2d 110, 115 (3d Cir. 1983); *Lund v. Weinberger,* 520 F.2d 782, 785 (8th Cir. 1975). While an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions, she is not permitted to make her own evaluations of the medical findings. *See McBrayer v. Sec'y of Health & Human Servs.,* 712 F.2d 795, 799 (2d Cir. 1983); *Filocomo v. Chater,* 944 F. Supp. 165, 170 (E.D.N.Y. 1996).

Accordingly, the undersigned finds that the ALJ improperly weighed the medical evidence, and failed to give sufficient justification for rejecting the treating physicians' findings. Therefore, the undersigned finds that this matter should be remanded for further fact finding in order to obtain a medical expert to reevaluate the weight to be given to the opinion of the treating physicians, Drs. Tepe and Moss, and to provide an accurate RFC assessment.

**B.**

For her second assignment of error, Plaintiff claims that the ALJ erred in finding that Plaintiff could work on a sustained basis. Specifically, Plaintiff claims that it must be shown that she can realistically perform in existing employment, and the fact that she may

have had symptom free periods of time, does not prove her ability to work on a sustained basis.

The fact that Plaintiff may have had symptom free periods of time does not prove the ability to work on a sustained basis. In *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001), the Court wrote:

> With regard to mental disorders, the Commissioner's decision "must take into account evidence indicating that the Plaintiff's true functional ability may be substantially less than the Plaintiff asserts or wishes." *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984). Given the unpredictable course of mental illness, "symptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse." *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996). Moreover, "individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E)(1999). "Such individual maybe much more impaired for work than their signs and symptoms would indicate." *Id.*

According to 20 C.F.R. § 404.1545 (b), to qualify for disability benefits, Plaintiff must not be able to engage in employment activities on a "regular and continuing basis." The activities described by Plaintiff do not equate to the ability to work on a "regular and continuing basis." *See* 20 CFR § 404.1572(c) ("Some other activities: generally we do not consider activities, like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social problems, to be substantial gainful activities."). *See also Baumgarten v. Chater*, 75 F.3d 366, 368 (8th Cir. 1996); *Owen v. Chater*, 913 F.Supp. 1413, 1420 (D. Kan. 1995).

According to SSR96-8 p, an RFC is an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a "regular and continuing" basis. *See* SSR 96-8p at 28. "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id. See also Sims v. Apfel*, 172 F.3d 879, 880 (10th Cir. 1999) (defining a "regular and continuing basis" as "8 hours a day, for 5 days a week, or an equivalent work schedule").

Plaintiff claims that the ALJ's limitations, that Plaintiff is able to "perform simple, routine, repetitive work in a low stress environment with no strict production requirement," do not adequately address the limitation of her ability to complete a normal workday, to maintain attention and concentration for extended periods, and to work within a schedule and maintain regular attendance. The undersigned agrees. In fact, the VE testified that Plaintiff's limitations would eventually cause Plaintiff to lose her job because she could not adequately complete the workday on a sustained basis. (Tr. 781). Accordingly, this matter should be remanded for further fact finding in order to properly evaluate whether Plaintiff's limitations would prevent her from working on a sustained basis.

### III.

A sentence four remand provides the required relief in cases where there is insufficient evidence in the record to support the Commissioner's conclusions and further fact-finding is necessary. *See Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 174 (6th Cir. 1994) (citations omitted). In a sentence four remand, the Court makes a final

judgment on the Commissioner's decision and "may order the Secretary to consider evidence on remand to remedy a defect in the original proceedings, a defect which caused the Secretary's misapplication of the regulations in the first place." *Faucher,* 17 F.3d at 175. "It is well established that the party seeking remand bears the burden of showing that a remand is proper under Section 405." *Culbertson v. Barnhart,* 214 F. Supp. 2d 788, 795 (N.D. Ohio 2002) (*quoting Willis v. Sec'y of Health & Human Servs.,* 727 F.2d 551 (6th Cir. 1984)).

## IV.

Based upon the foregoing, the undersigned concludes that remand is appropriate in this matter because there is insufficient evidence to support the ALJ's decision.

**IT IS THEREFORE RECOMMENDED** that the decision of the Commissioner to deny Plaintiff DIB benefits be **REVERSED**, and this matter be **REMANDED** under sentence four of 42 U.S.C. § 405(g).

On remand, the Commissioner shall obtain testimony and evaluation from a medical expert in order to reevaluate the weight to be given to the opinions of Dr. Tepe and Dr. Moss, and to provide an accurate RFC assessment. The medical expert shall examine Plaintiff and review all of her medical records. Additionally, the medical expert shall evaluate whether Plaintiff's limitations would prevent her from working on a sustained basis.

Date:   October 7, 2009             s/ Timothy S. Black
                                     Timothy S. Black
                                     United States Magistrate Judge

ELIZABETH FALCONI,               :        Case No. 1:08-cv-622
                                 :
        Plaintiff,               :        Chief Judge Susan J. Dlott
                                 :        Magistrate Judge Timothy S. Black
vs.                              :
                                 :
COMMISSIONER OF                  :
SOCIAL SECURITY,                 :
                                 :
        Defendant.               :

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written

objections to the proposed findings and recommendations within **TEN DAYS** after being

served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this

period is automatically extended to **THIRTEEN DAYS** (excluding intervening Saturdays,

Sundays, and legal holidays) when this Report is being served by mail and may be

extended further by the Court on timely motion for an extension.  Such objections shall

specify the portions of the Report objected to and shall be accompanied by a memorandum

of law in support of the objections.  A party may respond to another party's objections

within **TEN DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters,*

638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).